THE WAYNE PUMP CO. *v.* DEPT. OF TREASURY, STATE OF INDIANA, GROSS INCOME TAX DIVISION.

[No. 28,861. Filed January 28, 1953. Rehearing denied April 21, 1953.]

148

*James P. Murphy, Kennerk & Dumas,* and *Jack W. Kenny,* all of Fort Wayne, and *Willard Shambaugh,* (of counsel) of Fort Wayne, for appellant.

*Edwin K. Steers, Jr.,* Attorney General, *J. Emmett McManamon,* former Attorney General, *John J. Mc-Shane, Lloyd C. Hutchinson, Joseph E. Nowak, Robert F. Wallace, Earl E. Schmadel, William S. McMaster* and *George B. Hall,* Deputy Attorneys General, for appellee.

GILKISON, J.—During the years 1938, 1939 and 1940, appellant was engaged in Indiana in the business of manufacturing and selling certain pumps, equipment and machinery to the gasoline and oil trade, on conditional sales or installment contracts. On June 25, 1938 appellant entered into a contract with First Bancredit Corporation of Minneapolis, Minnesota, hereinafter called "Bancredit", and with The Texas Company, hereinafter called "Texaco", relative to the financing of some of its conditional sales contracts, which may herein be referred to as "paper" or "papers".

On June 22, 1942, appellee assessed appellant with additional gross income tax on receipts from its financing contract with Bancredit and Texaco, for the years 1938, 1939 and 1940 in the sum of $6,760.30 and interest in the sum of $230.40, a total of $6,990.70, which sum appellant paid, and on March 30, 1944, it filed its claim for refund thereof. This claim was denied by appellee. Appellant then filed its action in the Superior Court of Allen County against appellee to recover the amount so paid, with interest and upon

trial of the action a judgment was rendered for appellee and against appellant for costs.

Appellant's motion for new trial, for the reasons: (1) that the court erred in sustaining an amended motion to dismiss the first paragraph of the second amended complaint, (2) that the finding and judgment is not sustained by sufficient evidence and (3) that the finding and judgment is contrary to law, was overruled. This appeal was then taken.

Errors assigned are (1) in striking the tenth rhetorical paragraph of the first paragraph of the second amended complaint, (2) in sustaining appellee's motion to dismiss the first paragraph of the second amended complaint and (3) overruling appellant's motion for new trial. We shall discuss the alleged errors in the order given.

The first paragraph of the second amended complaint is based wholly upon the ground that the transactions upon which the alleged gross income tax is due, were transactions in interstate commerce and therefore not taxable as gross income under the Indiana gross income tax law. Rhetorical paragraph 10 of said paragraph is as follows:

"That all of said income accruing to it during the years in question and upon which said additional gross income taxes and interest were assessed and collected, and paid by this plaintiff in the amounts designated in its claim for refund as hereinabove alleged, was derived solely from business conducted by this plaintiff in commerce between this State and another State of the United States of America, and that said additional taxes and interest thereon so paid by the plaintiff to the defendant, as alleged herein, were illegally and improperly assessed and collected by the defendant."

Appellee's reasons for asking that this rhetorical

paragraph be stricken is that it is apparent on its face that it is argumentative in nature. We suppose it was stricken by the court for this reason.

We think the rhetorical paragraph 10 so stricken by the trial court, was a proper averment to be contained in this paragraph of the complaint on the theory that the transactions were in interstate commerce and as such were not taxable. Subsec. (a) §64-2606 Burns' 1951 Replacement. It was error to strike it out.

At the conclusion of the evidence in the trial of the case on July 14, 1950, appellee orally moved for dismissal of the first paragraph of the second amended complaint and the court took the matter under advisement until September 1, 1950. On September 5, 1950, before a judge pro tempore of the court, appellee filed its "amended motion to dismiss plaintiff's first paragraph of second amended complaint." In the written motion so filed it is contended that the court is without jurisdiction to pass upon the interstate commerce question presented by the first paragraph because in its claim for refund filed with appellee, appellant did not claim immunity on account of the interstate commerce nature of the transactions.

The amended motion to dismiss the first paragraph of the second amended complaint was sustained on July 2, 1951.

It always has been the rule in our court that the sufficiency of a complaint cannot be tested by a motion to strike or a motion to dismiss. *Yelton* v. *Plantz* (1948), 226 Ind. 155, 160, 77 N. E. 2d 895; *Huffman* v. *Newlee* (1919), 189 Ind. 14, 26, 124 N. E. 731; *Moorhouse* v. *Kunkalman* (1911), 177 Ind. 471, 481, 96 N. E. 600; *Guthrie* v. *Howland* (1905), 164 Ind. 214, 221 and authorities cited, 73 N. E. 259; *Port* v.

*Williams* (1855), 6 Ind. 219, 220. Such a motion cannot take the place of a demurrer.

It long has been the rule in this state that a court has no power to order an involuntary non-suit. *State ex rel. Hurd* v. *Davis, Judge* (1949), 227 Ind. 93, 98 et seq., 84 N. E. 2d 181; *Yelton* v. *Plantz* (1948), 226 Ind. 155, 160, 77 N. E. 2d 895, *supra; Williams* v. *Port* (1857), 9 Ind. 551; *Booe* v. *Davis* (1839), 5 Blkfd. 115.

The only power of a court to order a non-suit or dismissal of a plaintiff's action on a motion of defendants or some of them is given by clause "Fourth" of Section 2-901 Burns' 1946 Replacement as follows:

"An action may be dismissed without prejudice.
. . .

"By the court, on the application of some of the defendants, where there are others whom the plaintiff fails to prosecute with diligence.
. . .

"In all other cases, upon the trial, the decision must be upon the merits."

There is no contention that appellee's motion to dismiss the first paragraph of the second amended complaint was taken under this statute; nor is there any contention that the court was without jurisdiction of the subject-matter of the action set forth in the first paragraph of the second amended complaint. We cannot allow the contention of appellee that the court was without jurisdiction because in its claim for refund it did not allege that the transactions were in interstate commerce. It was the duty of the trial court at the trial to determine the issues joined on the first paragraph of the second amended complaint upon the merits. The dismissal of the first paragraph of the amended complaint ended that part

of appellant's case without a trial of the tendered issue. *State ex rel. Hurd* v. *Davis, Judge* (1949), 227 Ind. 93, 98, 84 N. E. 2d 181, *supra;* 17 Am. Jur. *Dismissal and Discontinuance,* §42, p. 82; *Brotherton Co.* v. *Jackson* (1925), 231 Mich. 604, 606, 204 N. W. 704; *Haney* v. *Grand Rapids Trust Co.* (1922), 221 Mich. 160, 162, 190 N. W. 684.

With respect to the second paragraph of the second amended complaint, the briefs of the parties indicate that for the years 1938, 1939 and 1940, appellant sold to various persons, on conditional sales contracts, pumps and other machinery of the gross value of $766,779.75 which contracts were transferred to Bancredit agreeable with a written contract entered into by appellant, Bancredit and Texaco, the purpose of which was to produce a plan for financing the manufacture and sale of equipment and machinery by appellant to Texaco. Bancredit was and is engaged in the business of purchasing installment obligations arising from the sale of equipment and machinery and desired to purchase such paper arising out of sales of equipment and machinery manufactured by appellant and sold to customers of Texaco.

The contract provided that Bancredit would buy such contracts in series of $200,000 each. Each contract to be accompanied by any chattel mortgage, conditional sales contract or other security device taken by appellant. Bancredit to pay face amount of paper less a discount rate of 5½% on declining balances, to be billed to appellant monthly. Appellant to save Bancredit harmless from any and all taxes assessed or accruing under laws of Indiana on any paper purchased. Appellant was made agent to make collections on all paper purchased by Bancredit.

Appellant agreed to use its best efforts and its col-

lection department facilities to collect for Bancredit all installments and payments due on paper sold under the agreement and to remit all such collections to Bancredit on the 10th day of each month, including all prepayments. To report not later than the 15th day of each month all delinquencies of thirty days or more or any other default. Bancredit and Texaco were given a right to examine appellant's records pertaining to the accounts of Bancredit or Texaco. Upon default by appellant of any of the terms of the contract, Bancredit was given the right to take over the collection of any paper being collected for it by appellant; appellant to pay Bancredit a collection charge equal to 10% of all amounts so collected by Bancredit.

Appellant further agreed to repurchase from Bancredit any paper so purchased which remains delinquent in any particular for 90 days or more and to pay Bancredit the discount provided for. Appellant reserved the privilege of repurchasing any paper which becomes delinquent before the lapse of ninety days, and the right to repurchase individual items which require special handling. If appellant should fail to repurchase any paper becoming ninety days or more delinquent, Bancredit was given the right to take over the equipment covered by the paper and to resell the same without prejudice to its other remedies—the sums received from such resales to be applied first to the payment of expenses incident to repossession and resale, and the residue to be applied upon the repurchase price appellant is bound to pay for such paper and thereupon appellant agrees to pay the balance of the repurchase price in full.

Appellant further agreed to assume 50% of the ultimate loss on all paper purchased by Bancredit and subject to repurchase by appellant to a total aggregate

amount of 10% of the original face amount of all such paper. Texaco assumes the ultimate loss to the same extent. Appellant and Texaco jointly assuming an aggregate total loss equal to 20% of the original face amount of all such paper. Appellant agreed to look to Texaco solely for the amount of the loss to be contributed by Texaco.

Texaco agreed to assume 50% of the ultimate loss on all paper purchased by Bancredit and subject to repurchase by appellant up to a total aggregate amount equal to 10% of the original face amount of all such paper. The intent being that appellant and Texaco shall bear the loss jointly to the aggregate amount of 20% of the original face amount of all such paper. Texaco further agreed to assume all the obligations of appellant to repurchase or to pay interest, and collection charges in case collections are taken over by Bancredit, in case of default by appellant, not to exceed 20% of the aggregate purchases.

The decisive question on the second paragraph of the second amended complaint is whether the transactions between appellant, Bancredit and Texaco, was a bona fide sale of the conditional sales contracts to Bancredit, or was in fact a loan by Bancredit and the assignment of the conditional sales contracts was a security for the loan. *Union Securities, Inc.* v. *Merchants Tr. & Sav. Co.* (1933), 205 Ind. 127, 134, 185 N. E. 150, 186 N. E. 261, 95 A. L. R. 1189 and Annotation, 1197 et seq.; *Department of Treasury, etc.* v. *Advance Paint Co.* (1944), 222 Ind. 294, 53 N. E. 2d 59.

A sale is the transfer of property in a thing for a price in money. The transfer of the property for a price is the essence of the transaction and the transfer must be of the general or absolute property as distinguished from a special property.

*Union Securities, Inc.* v. *Merchants Tr. & Sav. Co.*, *supra; Morrison* v. *St. Paul & Northern Pacific Ry. Co.* (1895), 63 Minn. 75, 65 N. W. 141, 30 L. R. A. 546; 46 Am. Jur. *Sales*, §2, p. 194.

A loan of money is a contract by which one delivers a sum of money to another and the recipient agrees to return at a future time an equivalent sum either ■ with or without interest or other legitimate charges. *Union Securities, Inc.* v. *Merchants Tr. & Sav. Co., supra; Department of Treasury, Etc.* v. *Advance Paint Co., supra; Nichols* v. *Fearson et al.* (1833), 7 Pet. (U. S.) 103, 8 L. Ed. 623, 625; Black's Law Dictionary, 3rd Ed., p. 1125, 1126; 54 C. J. S. *Loan—Loan of Money,* p. 653.

The test which determines whether the transactions between the parties was a loan or a sale is the intention of the parties. This intention is to be ascer- ■ tained from their written agreement and the entire transaction. In the case at bar the written agreement, we think, conclusively shows that the intention of the parties was to effect a loan of money at a profitable rate of interest to the lender, and to save the lender from any loss. *Union Securities, Inc.* v. *Merchants Tr. & Sav. Co., supra,* 205 Ind. 127, 138 and cases there cited; 95 A. L. R. 1189 and Annotation 1197 et seq.; 54 C. J. S. *Loan—Elements and Incidents,* p. 654.

In this situation the fact that the parties referred to the transaction as a sale, to the borrower as the seller and to the lender as the purchaser is not ■ controlling. Where accounts or other choses in action are transferred for a consideration equal to or less than their face value, of which consideration only a part is advanced in cash to the transferrer, the other part being retained by the transferee as a guaranty fund to indemnify itself for loss it may sustain

because of default in the payment of some of the paper transferred, and where the transferrer agrees to repurchase the papers that are in default, and where the transferree agrees to refund to the transferrer the excess of the collections of the paper over the amount actually advanced plus the transferree's charges, the courts, by a combination of these circumstances or some material part of them, have frequently declared the transaction a pledge of the accounts or choses in action as a security for a loan, rather than a sale. *Union Securities, Inc.* v. *Merchants Tr. & Sav. Co.*, *supra; Department of Treasury, etc.* v. *Advance Paint Co.*, *supra; In Re: American Fibre Reed Co.* (1913), 206 Fed. 309, 318, approved in *Home Bond Co.* v. *Mc-Chesney* (1916), 239 U. S. 568, 575, 60 L. Ed. 444, 447.[1] See also annotation, 95 A. L. R. 1197 to 1209 for many additional authorities.

1. "Upon the present appeal it is insisted that there was error in holding that petitioner and appellant, by virtue of the contracts between it and the bankrupts and the transactions and conduct of the parties, did not become the purchaser or owner of the accounts receivable in question, and that the transactions were really loans, with the accounts receivable transferred as collateral security. But it seems to us so entirely clear that the conclusions reached by the special master and approved by both courts were correct that we deem it unnecessary to discuss the matter at any length. To quote from the opinion of the district court: 'The considerations which support this conclusion are that the bankrupts were to and did collect the accounts and bear all expenses in connection with their collection; what is claimed to have been the purchase price for the accounts, towit, the difference between the face of the accounts and the discount, was not known until payment of the account and receipt thereof by the company, and then depended on the time that had elapsed since the date of the advance of the 75 per cent; what is claimed to have been deferred payment of the purchase price was simply a return to the bankrupt of the excess of the collection over and above the advance and discount; and the provision that, in the event of nonpayment of any of the accounts at maturity, or the debtor becoming insolvent, the bankrupt should repurchase the account and pay therefor the advance made thereupon, plus the discount. . . . In so far as the contracts in question here use words fit for a contract of purchase, they are mere shams and devices to cover loans of money at usurious rates of interest. That the company was not adverse to the use of shams is other-

It will be noted that the transfer contract between appellant, Texaco and Bancredit, among other things, provides: That the purchase price of the paper shall be the face value less 5½% discount on declining balances to be billed to appellant monthly; appellant to save the purchaser harmless from taxes under the law of Indiana; appellant to make collections on all paper purchased and to use its best efforts to collect all installments and payments due, and to remit all such collections including prepayments on the 10th day of each month; to report all delinquencies of thirty days or more or any other default not later than the 15th of each month; to permit Bancredit and Texaco to examine appellant's records pertaining to the accounts of Bancredit or Texaco; and on default of appellant of any terms of the contract, Bancredit had a right to take over the collection of any of the paper and appellant was obligated to pay Bancredit a collection charge equal to 10% of all amounts so collected.

Appellant agreed to repurchase any paper remaining delinquent for ninety days or more and to pay the discount provided for. On failure of appellant to repurchase delinquent paper, Bancredit was given the right to take over the equipment, to resell the same without prejudice to its other remedies, and after paying all expenses the residue to be applied on appellant's repurchase obligation. Appellant assumed 50% of the ultimate loss on all paper subject to repurchase, to an amount of 10% of the original face amount of all such paper. Texaco assumes ultimate loss to the same ex-

wise apparent from the use by it of the word "service," in its dealings with the bankrupts under the contracts, to characterize the discounts. In any view of the contracts those discounts were not charges for services rendered the bankrupts. Loans are never regarded as services.'" *Home Bond Company* v. *McChesney*, 239 U. S. 568, 60 L. Ed. 444, 447.

tent—the aggregate total assumption by appellant and Texaco being 20%.

The relation of appellant to Bancredit comes squarely within the rule laid down in *Union Securities, Inc.* v. *Merchants Tr. & Sav. Co., supra,* and the cases upon which it was founded. The gross sum received by appellant from Bancredit was borrowed money, and borrowed money and the repayment thereof are expressly exempted from gross income taxes by subsection (m) of Sec. 64-2601, Burns' 1951 Replacement. *Department of Treasury, etc.* v. *Advance Paint Co., supra.* The amount so received by appellant from Bancredit was therefore not a proper basis upon which to calculate the gross income tax due from appellant.

The proper basis upon which to calculate appellant's gross income tax for the years involved is the gross amount that it or its transferree, Bancredit, actually received in payments on the several accounts or choses in action which it transferred to Bancredit, and which appellant had not listed and paid gross income tax upon during each year involved.

For the reasons noted the judgment of the trial court is reversed with instructions to overrule defendant's motion to strike out rhetorical paragraph nine of the first paragraph of the second amended complaint; to overrule defendant's motion to dismiss the first paragraph of the second amended complaint, and to sustain plaintiff's motion for new trial of the cause agreeable with this opinion.

Emmert, C. J., not participating.

NOTE.—Reported in 110 N. E. 2d 284.