**HAMMOND LEAD PRODUCTS, INC., Petitioner,**

v.

**STATE OF INDIANA TAX COMMIS-SIONERS and State of Indiana Department of Revenue, Respondents.**

No. 45T05-8901-TA-00003.

Tax Court of Indiana.

Jan. 25, 1990.

Kenneth D. Reed, Hammond, for petitioner.

Linley E. Pearson, Atty. Gen. of Indiana by Marilyn S. Meighen, Deputy Atty. Gen., Indianapolis, for respondents.

FISHER, Judge.

Petitioner, Hammond Lead, is an Indiana corporation involved in the manufacture and sale of chemicals and lead chemical products. During the tax years involved, 1980 through and including 1984, Hammond Lead did all of its commercial banking with the Mercantile National Bank of Hammond, Indiana. During this time, Hammond Lead sought to periodically invest its excess cash reserves on a temporary basis. Hammond Lead wanted to obtain interest on its excess cash, but also wanted flexibility in accessing its cash.

The Mercantile National Bank (the "Bank") routinely purchased U.S. Treasury Notes and obligations for its own portfolio. The Bank accommodated its customers and clientele, by selling these obligations from its portfolio to its customers.

Hammond Lead and the Bank entered into agreements, whereby the Bank would sell U.S. Treasury Bills and Notes to Hammond Lead from its portfolio. These U.S. Treasury obligations were segregated and separately held on the Bank's records for Hammond Lead's account. The Bank also issued safekeeping receipts to Hammond Lead which evidenced the transactions.

At the time the Bank sold the obligations to Hammond Lead, Hammond Lead simultaneously agreed to resell them to the Bank at an agreed upon price and on a certain date. The Bank agreed to pay Hammond Lead interest at a fixed rate for the period between the original sale and the repurchase.

Hammond Lead fully paid Indiana adjusted gross income tax on the interest income earned pursuant to the repurchase agreements and timely filed claims for refund with the Indiana Department of Revenue. Hammond Lead contended that it was entitled to the exemption provided by 31 U.S.C. § 3124 and IC 6–3–1–3.5(b). The Department denied these claims for refund,

contending that Hammond Lead did not own the U.S. Treasury Notes and obligations and, therefore, was not entitled to the exemption.

The parties have stipulated that the issue of the intangibles tax is presently not before this court.[1] The issue to be decided is whether Hammond Lead's interest income, earned pursuant to the repurchase agreements, is exempt from Indiana adjusted gross income tax. Indiana law imposes a tax on the adjusted gross income of every resident corporation. IC 6–3–2–1. The "adjusted gross income" of corporations, under IC 6–3, means the same as "taxable income (as defined in Section 63 of the Internal Revenue Code)" less "income that is exempt from taxation under IC 6–3 by the Constitution and statutes of the United States." IC 6–3–1–3.5(b)(1). Thus, Indiana law implements 31 U.S.C. § 3124 (1982) (formerly 31 U.S.C. § 742, amended 1959)[2] which provides:

(a) Stocks and obligations of the United States Government are exempt from taxation by a state or political subdivision of a state. The exemption applies to each form of taxation that would require the obligation, the interest on the obligation, or both, to be considered in computing a tax, except—

(1) a nondiscriminatory franchise tax or another nonproperty tax instead of a franchise tax, imposed on a corporation; and

(2) an estate or inheritance tax.

The Department contends that the repurchase agreement between Hammond Lead and the Bank is nothing more than a short-term collateralized loan and does not fall within the scope of the immunity provided by 31 U.S.C. § 3124.

The only Indiana decision relevant to this issue is the Hamilton circuit court decision of *Estate of Haldon Kraft v. Indiana De-*partment of State Revenue* (Dec. 2, 1986), Hamilton Circuit Court, Cause No. C85–789, which involved a mutual fund. The circuit court did not distinguish transactions made pursuant to repurchase agreements, so the case does not have any persuasive effect on the issue before this court. Other jurisdictions have made such a distinction and have held that taxpayers who enter into repurchase agreements are not entitled to the exemption. *Andras v. Illinois Dep't of Revenue* (1987), 154 Ill. App.3d 37, 106 Ill.Dec. 732, 506 N.E.2d 439, *cert. denied,* 485 U.S. 960, 108 S.Ct. 1223, 99 L.Ed.2d 424; *Massman Constr. Co. v. Director of Revenue* (1989), Mo., 765 S.W.2d 592; *Borg v. Dep't of Revenue* (1989), 308 Or. 34, 774 P.2d 1099.

In *Andras,* a Massachusetts business trust agreed to purchase certain U.S. Government securities from a bank or other seller and simultaneously agreed to resell the same securities to the bank or seller. The Trust and the seller also agreed that the resale would occur on a certain fixed date, which was usually within a few days of the original sale. The seller agreed to pay the Trust a fixed rate of interest for the period between the original sale and the repurchase. The taxpayers bought shares in the Trust, and received dividends on those shares on a monthly basis. 106 Ill.Dec. at 733, 736, 506 N.E.2d at 440, 443.

The Illinois Department of Revenue argued that the income derived from the Trust's repurchase agreements could not be considered exempt income by the taxpayers. The court held:

If the Trust is not the true owner of these securities, but is merely loaning the sellers the securities' purchase price and thereby earning otherwise taxable interest income, we conclude that it may not shelter that income from State taxa-

---

**1.** The consolidated case of *Felix v. Indiana Department of Revenue* (Nov. 10, 1988), (Cause No. S186–406) and *Clarke v. Indiana Department of Revenue,* (Cause No. C85–0801), Sup.Ct. Cause No. 49S00–8905–CV–00388, which declared the Indiana intangibles tax unconstitutional and which is currently being appealed to the Indiana Supreme Court, will resolve this issue.

**2.** 31 U.S.C. § 3124(a) replaced 31 U.S.C. § 742 in 1981 without substantive change. As the tax years in issue in this case span from 1980 through 1984, any reference to § 3124(a) is also a reference to § 742 in its form during 1980.

tion by allowing the borrowers to secure the loans with tax-exempt Federal securities.

106 Ill.Dec. at 736, 506 N.E.2d at 443.

The court relied on the following criteria, established by the federal courts, which indicate a transaction is a loan:

(1) whether the seller could require the purchaser to resell the securities;

(2) whether the purchaser could require the seller to repurchase them;

(3) whether the agreement provides either party a specific remedy in the event that the other defaults;

(4) whether the seller agreed to pay interest at a stipulated rate between the sale and resale;

(5) whether the amount advanced does not necessarily equal the fair market value of the securities sold; (*See Citizens National Bank v. United States* (1977), 551 F.2d 832, 842, 213 Ct.Cl. 236).

(6) whether the identical securities are bought and sold; and

(7) whether the purchaser may sell the securities for the seller's account in the event of a default.

*See* I.R.S.Rev.Rul. 74–27 (1974–1 C.B. 24).

106 Ill.Dec. at 736–37, 506 N.E.2d at 443–44.

After examining the evidence, the court concluded that the Trust did not accept the risks of ownership and the transactions were secured loans. *Id.* at 737, 506 N.E.2d at 444.

In *Massman,* 765 S.W.2d at 592, Massman entered into agreements with two of its depository banks. On every business day Massman would telephone the banks and inform them of the amount of cash it had available for investment. The banks would then issue confirmations of the purchase of government bonds by Massman and confirmations of the resale of these bonds to the respective banks, usually effective the next business day. The bonds did not exist in tangible form and no entries were made on the books of the Federal Reserve evidencing Massman's interest in the securities.

The return for Massman's "ownership" was the difference between the "purchase price" and the "selling price." Massman contended that it was the owner of the bonds from the time of purchase until the time of mandatory resale and that its monetary return consisted of interest on obligations of the United States government, which was exempt from state income tax. The court held that Massman did not receive "interest or dividends on obligations of the United States government" by reason of the repurchase agreements. Rather, Massman received compensation from the banks for money paid to the banks out of its checking accounts. *Id.* at 594.

The court found the following facts to be significant: Massman never had physical possession of the securities and there was not any change in the bookkeeping entries after Massman "resold" them; the banks had a contractual right to substitute other securities; and the banks rather than Massman bore the risks of market fluctuations.

To this last fact the court stated, "We believe the risk of market fluctuations is the prime incident of ownership of securities." *Id.* at 594. The court also found it decisive that Massman could not resell its interest to anyone other than the banks. "True ownership of securities is indicated by the owner's ability to sell to third parties." *Id.*

In *Borg,* 774 P.2d at 1102, the court made the distinction between income earned on interest paid by the federal government to a mutual fund and income earned on payments made to the mutual fund by sellers of United States securities, other than the federal government, under repurchase agreements. In the latter situation, the income earned was not tax-exempt income.

The mutual fund in *Borg* was the American Association of Retired Persons U.S. Government Money Market Trust (the Trust). The taxpayers contended that income from the Trust's dealings in repurchase agreements was tax-exempt. These

were agreements in which a seller other than the United States sold federal obligations to the Trust and simultaneously agreed to repurchase the same or similar securities at a price that included interest for the period of the sale. The Oregon Supreme Court found that:

> Whether or not the income corresponds to and serves a function equivalent to interest, that income is not paid by the United States or other issuer but by the seller at the time of the repurchase. It is not 'interest' paid by the United States, which in fact may pay no interest to anyone during the period between sale and purchase.

*Id.* 774 P.2d at 1102.

Since the exemption applies to interest on obligations of the United States government which must be considered in the computation of the tax, the court concluded that the Trust was not entitled to the exemption. The court stated:

> In computing the tax on income from dealings in repurchase agreements, the Department considers the income earned by a buyer on resale; the interest rate on the United States obligation so traded may be important to the buyer and seller, but it is not material to the Department's computation.

*Id.*

The taxpayers in *Borg* contended that denial of the exemption would burden the United States Treasury by making the U.S. obligations a less attractive medium for such transactions. The court held that there was no evidence presented to show a significant effect on the marketability or interest costs of federal securities. The court concluded that "to find grounds for derivative tax immunity in every speculative marginal advantage for those who deal with the government and therefore to the government pushes the search for an economic incidence (as distinct from the legal incidence) of a tax too far." *Id.*

Hammond Lead contends that the facts of *Andras* and *Massman*, cited above, bear no resemblance to the facts in the case at bar. Hammond Lead purports that the taxpayers in *Andras* did not buy securities, but rather purchased interests in a mutual fund through a distributor. Thus, the taxpayers were not parties to the repurchase agreements. .

Even though the taxpayers in *Andras* were not direct parties to the repurchase agreements, the Trust was a direct party. The Trust passed everything through to its shareholders, so the taxpayers were in the same position as the Trust. The court found that the Trust was not the owner of the securities and was not entitled to the claimed exemptions. For this reason, the court denied the taxpayers the exemption. Therefore, Hammond Lead's reliance on the distinction that the taxpayers were not parties to the repurchase agreements is not persuasive.

Hammond Lead also attempts to distinguish *Andras* on the basis that an important factor in the court's decision was which party bore the risk of profit or loss, but there was no risk of profit or loss to either party in the case at bar. Also, Hammond Lead relies on the fact that in *Andras*, the Trust was merely loaning money to the original purchaser to enable it to purchase the securities, but in the case at bar, the bank routinely purchased the securities regardless of whether it sold them to Hammond Lead.

These distinctions relied upon by Hammond Lead are not significant. The courts have refused to grant the exemption to the party who does not bear the risk. Accordingly, if there is no risk to Hammond Lead, regardless of whether there is a risk to the Bank, then Hammond Lead cannot be granted the exemption.

Next, Hammond Lead argues that the facts of *Massman* can be distinguished from the case at bar. It argues, in *Massman*, there were no bookkeeping entries furnishing any evidence of a sale, the banks had a contractual right to substitute other securities for those described in the confirmation statements, the bank and not Massman bore the risk of market fluctuation, and the banks were obligated to add securities to the transaction in the event the market value of the securities already

purchased fell significantly prior to repurchase by the bank. Hammond Lead contends that, in the case at bar, there were bookkeeping entries, safekeeping receipts, and ledger records which distinguish it from *Massman*.

Despite Hammond Lead's assertions that the cases are factually distinct, the facts of each case are more similar than different. While there were bookkeeping entries and safekeeping receipts involved in the case at bar, these indicia of a sale do not necessarily establish proof that Hammond Lead owned the securities. As the court stated in *Massman*:

> The taxpayer argues ... that the parties have the right to cast the transactions in any form they choose, and that the director is bound by their choice of a transaction form in which the taxpayer becomes the owner of the securities. We always reserve the right to characterize the substance of transactions without regard to their form, when precise distinctions are legally significant. The paper trail is not conclusive.

765 S.W.2d at 595.

In the case at bar, the Bank could sell the securities during the term of the agreement and Hammond Lead could not sell, at any time, to a third party. Furthermore, each repurchase agreement stated, "We [the Bank] reserve, however, the right of substitution of securities of equal value and equal or better quality." As "true ownership of securities is indicated by the owner's ability to sell to third parties," the only possible conclusion is that Hammond Lead did not own the securities.

Hammond Lead submits that the reasoning in *American Bank and Trust Company v. Dallas County* (1983), 463 U.S. 855, 103 S.Ct. 3369, 77 L.Ed.2d 1072, is extremely important. In that case, the court held that the state could not impose a property tax on the bank's net assets without any deduction for tax-exempt United States obligations held by the bank. Although *American Bank* did not involve repurchase agreements, Hammond Lead finds the following reasoning significant:

The 1959 amendment rejected and set aside this Court's rather formalistic pre–1959 approach to § 3701. Under that approach, if a tax were imposed on a property interest or transaction separate from the ownership of federal obligations, the method by which the tax was computed was entirely irrelevant.... Under the plain language of the 1959 amendment, however, the tax is barred regardless of its *form* if federal obligations must be considered, either directly or indirectly, in *computing* the tax.

*Id.* at 862, 103 S.Ct. at 3374 (emphasis in original).

The language of *American Bank* is important to illustrate that the key factor to entitlement to the exemption is whether the federal obligations must be considered in computing the tax. However, Hammond Lead fails to show how this is favorable to its cause. Because of the repurchase agreements, the federal obligations need not be considered in computing the tax on the interest income earned by Hammond Lead. *See Borg*, 774 P.2d at 1102.

Based on the foregoing, there are several factors which bear on whether income earned pursuant to repurchase agreements of United States securities is exempt from state taxation:

First, which party actually owns the securities; evidence of ownership is indicated by which party bears the risk of market fluctuations and which party has the ability to sell to third parties. Hammond Lead did not bear any risk of market fluctuations and could not sell the securities to third parties.

Second, whether the income is actually earned as interest on United States obligations; this is evidenced by whether the seller or the United States government pays the interest income and whether the obligations must be considered in computing the tax. Hammond Lead contends that it shared in the interest paid by the government of the United States to the Bank. Admittedly, the United States government paid interest to the Bank. This interest became a part of the Bank's general in-

come flow. Hammond Lead, however, received interest income from the Bank by virtue of Hammond Lead's investment of its excess cash with the Bank. The interest rate on the United States obligations was not material to the computation of tax on Hammond Lead's interest income.

Third, and finally, whether there is a burden on the U.S. Treasury if the exemption is denied; Hammond Lead failed to prove that any such burden existed.

The court recognizes the benefits of the convenience provided by the Bank, but the repurchase agreement with Hammond Lead removes the elements of ownership and the source of interest necessary for exemption. Although the Bank and Hammond Lead may have effectuated a sale for other purposes, for tax purposes the result is, in effect, a collateralized loan. Therefore, Hammond Lead's claims for refund were appropriately denied.

Accordingly, it is therefore ORDERED, ADJUDGED, and DECREED that the Department's denial of Hammond Lead's claims for refund is affirmed. Judgment entered for the Department.

ORDERED.